Filed 6/9/15  P. v. Sanchez CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>EFRAIN EDZAIL SANCHEZ,<br><br>　　　Defendant and Appellant. | A140732<br><br>(Napa County<br>Super. Ct. No. CR166236) |

Defendant Efrain Sanchez appeals from the judgment entered following his plea of no contest to possession of a controlled substance (Health & Saf. Code, § 11377, subd. (a)).[1]  Defendant contends the trial court erred by denying his motion to suppress and imposing a restitution fine that violates ex post facto principles.  We affirm the judgment.

**BACKGROUND**

We summarize only the facts relevant to the issues on appeal.  The Napa County District Attorney (DA) filed a criminal complaint in June 2013 charging defendant with felony possession of a controlled substance and misdemeanor possession of drug paraphernalia and alleging a prior strike.  Defendant filed a motion to suppress (Pen. Code, § 1538.5) prior to the preliminary hearing.

At the hearing, Napa County Deputy Sheriff Erik Olson testified he has been a peace officer for over seven years.  Just before midnight on May 8, 2013, Olson was on patrol in the City of American Canyon.  Olson observed a vehicle driven by a person he

---

[1] All further statutory references are to the Health and Safety Code unless otherwise indicated.

1

subsequently identified as defendant coming toward him "very quickly, rapidly, and his music was extremely loud as he passed." Olson testified defendant's vehicle "continued to pass me, at which point I heard tires squealing, screeching, [in an] apparent loss of traction as he turned southbound onto Erin Drive from Corcoran." Based on the "extremely fast" rate at which defendant's vehicle approached and passed his vehicle, Olson visually estimated defendant was going 35 to 45 miles per hour (mph) in a 25-mph speed zone. Also, Olson believed the volume of the music blaring from defendant's vehicle violated Vehicle Code section 27007.[2]

Olson immediately turned around and drove into Erin Drive in an attempt to locate the vehicle. He noticed it parked in a driveway and saw defendant getting out. Olson parked opposite the driveway and got out of the patrol vehicle. He identified himself as a police officer, told defendant to stop, explained the reason for the stop and asked him to approach. At that point, the engine in defendant's car was still running and extremely loud music continued to blare from the vehicle. Defendant walked over to Olson as requested. Olson asked if he had any weapons on his person and defendant stated he had a knife. Olson informed defendant he was going to pat him down for weapons and asked him to place his hands behind his back. Defendant refused, stating he did not consent to a search of his person. Olson grabbed defendant's hands, placed them behind defendant's back, and conducted a pat down search. Olson found a pocket knife inside a nylon holster attached to defendant's waist.

After the patdown search, Olson went over to defendant's car and turned off the music. Defendant was agitated and did not want Olson to enter his vehicle. After turning off the music, Olson called for additional units to respond, asked dispatch to run a search on defendant and continued to question him. Olson inquired why defendant had pulled into the driveway and defendant stated he was there to see a friend. Olson smelled a faint

---

[2] Vehicle Code section 27007 provides in relevant part: "No driver of a vehicle shall operate, or permit the operation of, any sound amplification system which can be heard outside the vehicle from 50 or more feet when the vehicle is being operated upon a highway . . . ."

odor of alcohol on defendant and asked if he had been drinking. Initially, defendant denied he had been drinking, but then said he had had "one drink at Blue Rock," a local golf club. Within a few minutes, dispatch advised defendant had a valid driver's license, no outstanding warrants and was not on probation.

However, because defendant admitted he had been drinking, Olson decided to perform the horizontal gaze nystagmus test on defendant for road safety purposes. Although Olson did not observe any indication of nystagmus, he did notice that when he shined his flashlight at defendant's eyes just outside of defendant's peripheral vision, defendant's "pupils were very slow to react to the light." This suggested to Olson that defendant was potentially under the influence of a controlled substance. Also, Olson had instructed defendant to keep his hands by his side during the nystagmus test and noticed defendant's hands were "fidgety" as he performed the test.

Around this time, Officers Hernandez, Edelman and McClurg arrived at the scene. When Officer Edelman started to peer into defendant's vehicle, defendant became very agitated and told Edelman he was not allowed to search the vehicle. Olson asked if defendant had anything illegal in the car and whether he would consent to a search of it. Defendant replied in the negative to both questions. Defendant also denied he had used any controlled substance and declined the officers' request to submit to a blood draw or urine sample.

Olson then continued his evaluation of whether defendant was under the influence. He first asked defendant "a series of medical pre-examination questions" before measuring defendant's pulse rate. Olson determined defendant had a elevated heart rate of 138 beats per minute against a normal range of 60 to 90 beats per minute. Olson also performed a pupillary comparison test and noticed that when he shined a pen light in defendant's eyes, his pupils took two seconds to fully dilate, which is twice as long as normal. In addition, Olson asked defendant to perform the Romberg test, in which the subject is asked to stand with feet together, hands at the side, and head tilted back, and then estimate when 30 seconds has elapsed. Defendant estimated 24 seconds and during the test his eyelids fluttered slightly and his hands were fidgety. Olson took defendant's

pulse again about five minutes after the first test, and measured defendant's pulse at 136 beats per minute. He also administered a preliminary alcohol screening test, which measured .008 percent.

Based on Olson's observations during tests described above, including defendant's "high pulse, agitated behavior, the fidgety hands, the involuntary eyelid tremor, his constricted eyes, which were slow to react, [and] his increased internal clock on the Romberg test," Olson placed defendant under arrest for being under the influence of a controlled substance. Olson handcuffed defendant and placed him in the back of his patrol car. Officer Hernandez then conducted a search of defendant's vehicle incident to the arrest. Hernandez' police dog alerted to the front center console, and in the glove box Hernandez located a glass smoking pipe containing a partially burned material. Hernandez also found a digital scale in the back seat with a "white powdery like residue in it." Subsequent testing of the contents of the pipe showed it contained 0.16 grams of methamphetamine.

At the conclusion of Officer Olson's testimony, the court invited argument from defense counsel on the motion to suppress. Defense counsel argued Olson's initial detention of defendant lacked reasonable suspicion. She further argued that even if the initial detention was lawful, the officer lacked probable cause to arrest defendant. The court denied the motion to suppress. The court found the initial detention was based upon reasonable suspicion because "it's fairly straightforward that an experienced officer can assess whether a car is driving above the safe speed in an area," and the officer had probable cause to arrest defendant for being under the influence based on his observations of defendant during the field tests.

On June 25, 2013, the DA filed an information charging defendant with felony transportation of a controlled substance (§ 11379, subd. (a)) (count 1); felony possession of a controlled substance (§ 11377, subd. (a)) (count 2); misdemeanor possession of controlled substance paraphernalia (§ 11364) (count 3); and misdemeanor being under the influence of a controlled substance (§ 11550, subd. (a) (count 4)). Additionally, the DA alleged defendant had suffered a prior strike pursuant to Penal Code section 1170.12,

4

subdivisions (a)–(d) and a prior felony prison term within meaning of Penal Code section 667.5, subdivision (b).

On September 27, 2013, defendant filed a renewed motion to suppress. Stating it had reviewed the transcript of the preliminary hearing, the trial court also found there was reasonable suspicion to detain defendant, and "would like to focus our conversation on probable cause to arrest." After entertaining argument of counsel on that issue, the trial court concluded there was probable cause to arrest based on Officer Olson's testimony.

Defendant subsequently entered a no contest plea to count 2 of the information— felony possession of a controlled substance. On the DA's motion, the trial court dismissed counts 1, 3, and 4, as well as all special allegations. The trial court sentenced defendant to a three-year period of probation and imposed a $40 court security fee and a $30 criminal conviction fee and a restitution fine in the amount of $300. Defendant filed a timely notice of appeal on January 9, 2014.

## DISCUSSION

### A.    *Detention and Arrest*

" 'In reviewing a suppression ruling, "we defer to the . . . court's express and implied factual findings if they are supported by substantial evidence, [but] we exercise our independent judgment in determining the legality of a search on the facts so found." ' [Citation.]" (*People v. Tully* (2012) 54 Cal.4th 952, 979 (*Tully*).) This means we view the evidence in a light most favorable to the order denying the motion to suppress, resolve any conflicts in the evidence in favor of the court's ruling, and defer to the court's assessment of credibility. (*Ibid.*)

Here, defendant contends the trial court's suppression ruling was erroneous for three reasons: (1) his initial detention was not based on reasonable suspicion; (2) even if the initial detention was lawful, the detention was impermissibly prolonged in violation of his constitutional rights; and, (3) his arrest was without probable cause.[3]

---

[3] Defendant also maintains the trial court "improperly shifted the prosecution's burden" to show the search of defendant's vehicle was legal as a search incident to arrest. He bases this assertion on the court's ruminations during oral argument about whether, in

5

"Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]. [Citations.] An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances. As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred. [Citations.]" (*Whren v. United States* (1996) 517 U.S. 806, 809–810; see also *Arburn v. Department of Motor Vehicles* (2007) 151 Cal.App.4th 1480, 1484 (*Arburn*) [" ' "Under the Fourth Amendment, government officials may conduct an investigatory stop of a vehicle only if they possess 'reasonable suspicion: a particularized and objective basis for suspecting the particular person stopped of criminal activity.' . . ." ' ".) " 'If there is a legitimate reason for the stop, the subjective motivation of the officer is irrelevant.' [Citations.]" (*Tully, supra,* 54 Cal.4th at p. 980.) Moreover, " 'the law contemplates that the officer may temporarily detain the offender at the scene for the period of time necessary to discharge the duties that he incurs by virtue of the traffic stop.' [Citations.]" (*Ibid.*)

Officer Olson testified he stopped defendant because he believed defendant violated Vehicle Code sections 22350 and 27007. Section 22350 of the Vehicle Code states: "No person shall drive a vehicle upon a highway at a speed greater than is reasonable or prudent having due regard for weather, visibility, the traffic on, and the surface and width of, the highway, and in no event at a speed which endangers the safety of persons or property." Olson observed defendant's vehicle coming toward him

the absence of expert opinion to the contrary, it had to accept an experienced officer's opinion that the indicators he identified showed defendant was under the influence of a controlled substance. The trial court's ruminations on that issue are irrelevant because "[u]nder the procedural posture here of a motion to suppress denied by the [magistrate] and renewed in the superior court upon the preliminary hearing transcript alone, we are concerned solely with the findings of the [magistrate]." (*People v. Gentry* (1992) 7 Cal.App.4th 1255, 1262.) In any event, the trial court ultimately rendered a decision based on "an independent evaluation of the evidence" that the officer had probable cause to arrest defendant.

"extremely fast" on a dark, two-lane city road, where the only visibility was provided by vehicle headlights. Olson estimated defendant's vehicle passed him going between 35 and 45 mph in a 25-mph zone. Just after defendant passed Olson, his vehicle lost traction while turning rapidly onto a residential street. Under these circumstances, the traffic stop was based on reasonable suspicion defendant was in violation of Vehicle Code section 22350.[4] (Cf. *Arburn, supra,* 151 Cal.App.4th at pp. 1485–1486 [officer's observation of vehicle weaving within a lane of traffic justified traffic stop].)

However, even if the initial detention was lawful, defendant contends it was impermissibly prolonged in violation of his constitutional rights. Defendant did not advance this claim below and has therefore forfeited it. (See *Tully, supra,* 54 Cal.4th at p. 980 & fn. 9 [claim that traffic stop was of excessive duration in relation to its purpose forfeited on appeal because not argued below; such a claim involves an analysis "the trial court was not asked to conduct" and is not one of a narrow class of *fundamental* constitutional rights exempt from the forfeiture rule].)

Even if not forfeited, the contention is without merit. As noted above, an officer may temporarily detain the offender at the scene for " 'the period of time necessary to discharge the duties that he incurs by virtue of the traffic stop.' " (*Tully, supra*, 54 Cal.4th at p. 980.) Those duties include examining the offender's driver's license and registration and writing a citation if necessary, as well as " 'certain other steps customarily taken as matters of good police practice,' " such discussing the violation with the motorist, listening to any explanation the latter may wish to offer, and ensuring vehicle and driver safety. (*Id.* at p. 981.) " 'Each of the foregoing steps, of course, requires a certain amount of time to accomplish.' [Citation.]" (*Ibid.*)

Here, after checking defendant's driver's license and ensuring he had no outstanding warrants, Officer Olson continued to detain defendant because he smelled alcohol on him and defendant admitted he had been drinking. Determining whether defendant was impaired was simply " 'good police practice' " (*Tully, supra*, 54 Cal.4th at

_____

[4] We therefore need not, and do not, discuss whether the officer had reason to detain defendant for also violating Vehicle Code section 27007.

p. 981), in view of the fact Olson had stopped defendant for driving excessively fast in a 25-mph zone and defendant almost lost control of his vehicle while turning the corner into a residential street. After Olson administered the standard field sobriety tests to assess driver impairment, he arrested defendant for being under the influence. Under these circumstances, the length of the detention was justified by the " 'the period of time necessary to discharge the duties' " Officer Olson incurred " 'by virtue of the traffic stop.' " (*Id.* at p. 980.)[5]

Defendant also contends his arrest was not supported by probable cause. "The term 'probable cause' has an established meaning in connection with criminal proceedings, and signifies a level of proof below that of proof beyond a reasonable doubt, or even proof by a preponderance of the evidence. It refers to 'a state of facts as would lead a man of ordinary caution and prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused.' [Citations.]" (*People v. Hurtado* (2002) 28 Cal.4th 1179, 1188–1189.)

Officer Olson arrested defendant for being under the influence of a controlled substance in violation of section 11550. "One may be guilty of *being* under the influence of drugs in violation of Health and Safety Code section 11550 by being in that state *in any detectable manner*: ' "The symptoms of being under the influence within the meaning of that statute are not confined to those commensurate with misbehavior, nor to those which demonstrate impairment of physical or mental ability." ' [Citations.]" (*People v. Canty* (2004) 32 Cal.4th 1266, 1278, second italics added.) Officer Olson had probable cause to arrest defendant for being under the influence of a controlled substance based on his observations of defendant's high pulse, agitated behavior, fidgety hands,

---

[5] In arguing his detention was unlawfully prolonged, defendant relies on *People v. Lingo* (1970) 3 Cal.App.3d 661. This reliance is misplaced. *Lingo* did "not deal with a case of interrogation during a detention still lawfully continuing for some other reason" (*id.* at p. 664), such as the field tests administered here upon suspicion of impairment. Rather, *Lingo* dealt "only with . . . a detention unlawfully continued after any lawful purpose had passed and therefore imposed solely for the purpose of asking a question based either on pure hunch or on mere routine police practice." (*Ibid.*) Thus, *Lingo* is inapposite.

involuntary eyelid tremor, slowly dilating pupils and increased internal clock on the Romberg test.

**B.** *Restitution Fees*

At sentencing, the court ordered defendant to pay a restitution fine pursuant to Penal Code section 1202.4 in the amount of $300—the minimum amount permissible by statute at the time of sentencing. However, when defendant committed the offense in May 2013, the statutory minimum restitution fine was $280.[6] Defendant contends the trial court intended to impose the "statutory minimum" fine, therefore imposition of a restitution fine in the amount of the statutory minimum in effect *at the time of sentencing* violates ex post facto principles.

This contention is belied by the record, as demonstrated by the following colloquy at sentencing:

"THE COURT:  You must pay … a [restitution fine]—for felonies it's $240.

"JUDICIAL ASSISTANT:  It's $300 now.

"THE COURT:  Thank you.  $300 restitution fine.  And you—

"MS. HENDRY:  I am objecting. This is a crime that occurred in August of last year, I believe.

"THE COURT:  I understand.  But the restitution fine can go up to $10,000, so [$300] is still low compared to the maximum.  It's not ex post facto.  At least I'm not finding it's ex post facto on account of it being the minimum fine, and much less than what is even allowable before the change."

This colloquy demonstrates the ex post facto issue was expressly brought to the court's attention, and the court understood the potential problem.  It also demonstrates the court knew the applicable monetary parameters for the amount it could legally impose for

---

[6] Penal Code section 1202.4 provides in relevant part:  "The restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense. If the person is convicted of a felony, the fine shall not be less than two hundred forty dollars ($240) starting on January 1, 2012, two hundred eighty dollars ($280) starting on January 1, 2013, and three hundred dollars ($300) starting on January 1, 2014, and not more than ten thousand dollars ($10,000)."  (Pen. Code, § 1202.4, subd. (b)(1).)

9

a restitution fine, and that it exercised its discretion to impose a restitution fine in the specific amount of $300 (and well within the amount allowable), and did not impose merely the "statutory minimum."  Thus, the court did not violate ex post facto principles in imposing the restitution fine.  (*People v. Callejas* (2000) 85 Cal.App.4th 667, 670 ["A statute violates the ex post facto clause when, on its face or as applied, it retroactively ' "increase[s] the punishment for criminal acts." ' "].)

Nor has defendant demonstrated the amount selected by the court was irrational or arbitrary.  (See *People v. Mearns* (2002) 97 Cal.App.4th 493, 498 [restitution order is reviewed for abuse of discretion]; *People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977–978 [defendant has the burden of showing that the court's sentencing decision was irrational or arbitrary and absent such a showing " 'the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.' [Citation.]"].)

## DISPOSITION

The judgment is affirmed.

_____
Banke, J.

We concur:


_____
Humes, P. J.


_____
Dondero, J.


A140732, *People v. Sanchez*

11